In re Charles Douglas
SCHMIDT Debtor.

HOWARD & SONS, INC., Plaintiff,

v.

Charles Douglas SCHMIDT Defendant.

Bankruptcy No. 83–60457.
Adv. No. 83–6159.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Oct. 6, 1986.

Jill Olson, Merrillville, Ind., for debtor.

Daniel Freeland, Highland, Ind., Harold Abrahamson, Hammond, Ind., for creditor—Howard & Sons.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

KENT LINDQUIST, Chief Judge.

### I

### Statement of Proceedings

This adversary proceeding came on for a bench trial on May 8, 1986 pursuant to pretrial Order of October 25, 1985 on the amended complaint of G and E Incorporated d/b/a Howard and Sons (hereinafter: "Howard") filed on June 20, 1983 alleging that the indebtedness to it by the Debtor-Defendant, Charles Schmidt (hereinafter: "Schmidt") is nondischargeable on the grounds of fraud pursuant to 11 U.S.C. § 523(a)(2).

Submitted. Evidence and arguments heard.

### II

### Findings of Fact

Howard's president, Francis Eenigenburg testified as follows:

Schmidt had been an employee of Howard for over ten years and then had decided to go into business himself and in fact did open up a meat market in Wheatfield, Indiana. On January 30, 1980 Howard and Schmidt entered into an "Exclusive Purchase Contract" (Plaintiff's exhibit no. 1). Pursuant to this contract Howard agreed to in turn sell Schmidt all of Schmidt's beef and pork products and Schmidt agreed to sell exclusively certain products of Howard as set out therein. The terms of payment pursuant to clause 4 of the purchase agreement was that Schmidt pay for all deliveries within ten (10) days from the date of delivery.

Eenigenburg further related that Schmidt went into default on the purchase of the product in the sum of approximately $42,000.00 and a suit for said monies was filed in the Porter Superior Court. Settlement negotiations then ensued and the parties orally agreed that Schmidt would pay for products by check on delivery and in addition pay $100.00 at the time of each delivery to apply on the unpaid arrearage.

Finally, on July 14, 1981, the parties and Chuck's Meat and Produce, Mart, Inc., Schmidt's alleged corporation (hereinafter "Chuck's"), entered into a written agreement entitled "mutual release" to settle the claims of Howard versus Schmidt and Chuck's arising out of the January 30, 1980 agreement (Plaintiff's exhibit no. 3). The agreement provided as follows:

1. Schmidt would cause Chuck's to deliver to Howard two cashiers checks in the sum of $3,000.00 and $5,500.00 for a total of $8,500.00 (copies of these cashiers checks are attached to Plaintiff's exhibit no. 3);

2. Howard would be permitted to retake the inventory previously sold to Chuck's on account (no value of the inventory was set out in the agreement);

3. Howard would accept the checks in full payment of the obligation of Schmidt and/or Chuck's; and

4. Execution of mutual releases of all claims whatsoever each party had against the other.

The agreement does not refer to the total amount due by the Defendant to the Plaintiff as the result of the sale of the product by the Plaintiff to the Defendant pursuant to the original agreement at the time the mutual release was executed, nor does it refer to the four checks issued by the Defendant to the Plaintiff just prior to the execution of the agreement. (See Plaintiff's exhibit no. 2 *infra*). Neither did it refer to the value of the inventory that the Defendant agreed to return to the Plaintiff.

Eenigenburg further related that prior to execution of the agreement he discussed the wholesale value of the remaining inventory to be returned to Howard with Schmidt's attorney during the settlement negotiations and just prior to signing the mutual release. According to Eenigenburg, Schmidt's attorney stated that the wholesale value thereof was $15,000.00 to $20,000.00, but that he was not given an opportunity to physically inspect the product prior to the execution of the mutual release as Schmidt refused to allow a rep-

resentative of Howard to take an inventory. Eenigenburg related that when Howard did in fact take the physical inventory on July 15, 1981, the wholesale value of the product was in fact $8,000.00.

Eenigenburg asserted that just prior to the execution of the mutual release on July 14, 1981, Chuck's had issued four checks to Howard (Plaintiff's exhibit no. 2). These checks were as follows:

| Ck.No. | Date | Drawer | Signatory | Drawee | Amount | Check Memo |
|---|---|---|---|---|---|---|
| 819 | 7/07/81 | Chuck's | C.Schmidt | Howard | $ 100.00 | on Account |
| 828 | 7/10/81 | Chuck's | P.Schmidt | Howard | $ 100.00 | on Account |
| 818 | 7/10/81 | Chuck's | C.Schmidt | Howard | $4,770.00 | Inv.31134 |
| 827 | 7/13/81 | Chuck's | P.Schmidt | Howard | $ 578.00 | Inv.31253 |

Eenigenburg stated that all checks were deposited prior to the execution of the July 14, 1981, mutual release and credit for these checks were given by Howard in arriving at the settlement although as noted above, no dollar amount as to the balance due by Schmidt to Howard was set out in the mutual release nor was a dollar amount assigned to the value of the remaining inventory.

Eenigenburg stated that the two $100.00 checks were for payment on account to be applied to the arrearage, and that while the two invoice numbers on the two other checks were Howard invoice numbers, he did not have personal knowledge as to exactly what product was purportedly paid for by those checks, when the product was delivered, or whether said checks were post-dated or not as was occasionaly done in past.

The parties stipulated that check # 819 was deposited July 9, 1981; check # 818 was deposited July 10, 1981, and check # 828 was deposited July 13, 1981. The deposit date on check # 827 could not be deciphered.

The plaintiff then introduced plaintiff's exhibit no. 4 which were stop payment requests signed by Patricia Schmidt on behalf of Chuck's stopping payment on all four of the above checks. The request to stop check # 818, # 819 and # 827 were made on July 13, 1981, and the request to stop payment on check # 828 was made on July 14, 1981. Only one stop payment request stated a reason for the stop payment

and that was check # 818 which stated "defective meat".

Eenigenburg declared that Schmidt never advised him that he intended to stop payment on the checks and that if Schmidt had so advised him he would have never entered into the mutual release dated July 14, 1981.

The mutual release agreement was executed at the office of Schmidt's counsel. Schmidt was not present nor was Howard's attorney as Howard's attorney advised he would not be there. Eenigenburg related he agreed to proceed on that basis, was given an opportunity to read the mutual release, did in fact read the mutual release and voluntarily agreed to proceed with the settlement on that basis. No discussions were had between Eenigenburg and Schmidt regarding the terms of the mutual release.

Eenigenburg stated that after the mutual release was signed he was personally present and heard Schmidt state that he was aware the stop payment request was made prior to the execution of the mutual release and that the stop payment requests were executed by Patricia Schmidt upon Schmidt's instructions.

Schmidt was not present at the trial and presented no evidence. Schmidt's counsel tendered a discovery deposition taken at Schmidt's request. Howard objected and the court sustained that objection.

The Court takes judicial notice of Schedule A–3 of Schmidt's unsecured claims which lists a disputed debt to Howard in

the sum of $48,368.90 and 2.C of Schmidt's statement of Financial Affairs where he stated he was a partner in Chuck's Meat Market but did not advise who the other partners were.

No evidence was presented as to whether Chuck's Meat and Produce Mart, Inc., was in fact a corporation although that designation appeared on the four checks as the drawer where stop payment requests had been issued.

Schmidt moved to dismiss the case pursuant to Fed.R.Civ.P. 12(h) on the grounds that the real parties in interest was Chuck's and not Schmidt and pursuant to Fed.R.Civ.P. 41(b) that upon the facts and the law Howard had shown no right to relief. The Court denied both motions.

### III

### Conclusions of Law and Discussion

At the outset the Court would like to note some basic legal principles that apply to adversary proceedings instituted by a creditor to have a debt determined to be nondischargeable pursuant to 11 U.S.C. § 523.

In keeping with the purpose of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed in favor of the Debtor. *In re Linn*, 38 B.R. 762 (9th Cir. B.A.P.1984); *In re Marino*, 29 B.R. 797 (N.D.Ind.1983). The exceptions to dischargeability must be narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code. *In re Norman*, 25 B.R. 545 (Bankr. S.D.Cal.1982). This is done to effectuate the fresh start policies of the Bankruptcy Code. *In re Levitan*, 46 B.R. 380 (Bankr. E.D.N.Y.1985); *In re Nicoll*, 42 B.R. 87 (Bankr.N.D.Ill.E.D.1984).

Although, the nondischargeability provision of the Bankruptcy Code has no provisions allocating the burden of proof brought under it, the creditor must establish that the debt is nondischargeable and has the burden on each element. *In re Kreps*, 700 F.2d 372, 376 (7th Cir.1983); *In*

*re Bowers*, 43 B.R. 333 (Bankr.E.D.Pa. 1984); *Matter of Reinstein*, 32 B.R. 885 (Bankr.E.D.N.Y.1983); *In re Paley*, 8 B.R. 466 (Bankr.E.D.N.Y.1981). The creditor objecting to discharge of a debt in bankruptcy bears a heavy burden of proof to establish that the debt is squarely within the statutory exceptions. *In re Marino*, 29 B.R. 797, 799, *supra*. The party objecting on the ground of fraud must establish each element of the claim by clear and convincing evidence. *In re Kimzey*, 761 F.2d 421, 423 (7th Cir.1985).

The Court in *Matter of Pappas*, 661 F.2d 82 (7th Cir.1981) in a case interpreting the predecessor to 11 U.S.C. § 523(a)(2) (11 U.S.C. § 35(a)(2)) held that Bankruptcy Court had exclusive jurisdiction to determine the meaning of false pretenses and false representations without having to look at Indiana law. There have been only slight changes between 11 U.S.C. § 35(a)(2) and the present 11 U.S.C. § 523(a)(2) and thus the foregoing principle as to applicable law in a fraud case as set out in *Pappas* remains a correct statement of law under the 1978 Code. *See, Birmingham National Bank v. Case*, 755 F.2d 1474 (11th Cir.1985), where it was held because of the negligible differences, case law under the Act serves as a useful guide under the 1978 Code.

The cases construing the 1978 Code are consistent with the Act case of *Pappas*, and hold that the question of whether a debt is dischargeable is one of federal law. *In re Tapp*, 16 B.R. 315 (Bankr.D.Alaska 1981); *In re Liberati* 11 B.R. 54 (Bankr.E. D.Penn.1981).

11 U.S.C. § 523 provides as follows:

§ 523. **Exceptions to discharge.**

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's or an insider's financial condition;

The basic elements of the Plaintiff's claim which must be proved by clear and convincing evidence pursuant to 11 U.S.C. § 523(a)(2)(A) are as follows:

1. That the debtor obtained the money (property or services) through representations which the debtor either knew to be false or made with such reckless disregard for the truth as constitutes a willful misrepresentation;

2. That the debtor possessed scienter, i.e. an intent to deceive; and

3. That the creditor relied on the false representation and the reliance was reasonable.

*In re Kimzey*, 761 F.2d 421, 423, *supra.*

 As to the scienter element, an intent to deceive may logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan (or otherwise part with property or services). *Id.* at 424. Because direct proof of reliance is difficult, actual reliance may be proven by circumstantial evidence of reliance. *In re Kreps*, 700 F.2d 372, 375, *supra.* The actual reliance must be reasonable. The Seventh Circuit has held that the reliance test is not meant to "second guess a creditor's decision to make a loan or set loan policy for a creditor". *Matter of Garman*, 643 F.2d 1252 (7th Cir.1980), *cert. denied sub nom. Garman v. Northern Trust Co.*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). In addition, the Court is not empowered to "undertake a subjective evaluation and judgment of a creditor's lending policies and practices". *Id.* at 759.

It is important to note the legislative history to 11 U.S.C. § 523(a)(2)(A). The relevant portion of the Senate Report is as follows:

Paragraph (2) provides that as under Bankruptcy Act section 17a(2), a debt for obtaining money, property, services, or a refinancing extension or renewal of credit by false pretenses, a false representation, or actual fraud, or by use of a statement in writing respecting the debt-

or's financial condition that is materially false, on which the creditor reasonably relied, and which the debtor made or published with intent to deceive, is excepted from discharge. This provision is modified only slightly from current section 17a(2). First, "actual fraud" is added as a ground for exception from discharge.

Senate Report No. 95–595, 95th Cong., 2nd Sess. 77–79 (1978). Reprinted in 4 *Norton Bankruptcy Law and Practice*, Annotated Legislative History, § 523, page 396 (Callaghan and Company, 1983).

The legislative statements are as follows: [t]hus, under section 523(a)(2)(A) a creditor must prove that the debt was obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insiders financial condition. Subparagraph (A) is inteded to codify current case law e.g., *Neal v. Clark*, 95 U.S. [5 Otto] 704 [24 L.Ed. 586] (1887), which interprets "fraud" to mean actual or positive fraud rather than fraud implied in law. Subparagraph (A) is mutually exclusive from subparagraph (B). Subparagraph (B) pertains to the so-called false financial statement ...

124 Cong.Rec. H11095–96 (Daily Ed. Sept. 28, 1978); S17412 (Daily Ed. Oct. 6, 1978). Reprinted 4 *Norton Bankruptcy Law and Practice*, Annotated Legislative History, § 523, page 397 (Callaghan and Company 1983).

 There must be proof of positive fraud and this involves showing that the acts which constitute fraud involved moral turpitude or an intentional wrong; and fraud implied in law which does not require a showing of bad faith or immorality is insufficient. *In re Gilman*, 31 B.R. 927, 929 (Bankr.S.D.Fla.1983); *In re Montbleau*, 13 B.R. 47, 48 (Bankr.D.Mass.1981); *In re Byrd*, 9 B.R. 357, 359 (Bankr.D.C. 1981); *In re McAdams*, 11 B.R. 153, 155 (Bankr.D.Vt.1980); *In re Slutzky*, 22 B.R. 270, 271, (Bankr.E.D.Mich.S.D.1982) Therefore, a mere breach of contract by the debtor without more, does not imply

existence of actual fraud for purposes of the exception to discharge under Section (a)(2)(A). *In re Emery*, 52 B.R. 68, 70 (Bankr.E.D.Pa.1985). However, if a debtor enters into a contract intending not to comply with its terms and later defaults under that contract, such contract may provide a basis for exceptions to discharge on the grounds of fraud *if the other remaining elements are satisfied. In re Taylor*, 49 B.R. 849, 851 (Bankr.E.D.Pa.1985); *In re Fenninger*, 49 B.R. 307, 310 (Bankr.E.D. Pa.1985).

It has also been correctly held that, by itself, a mere failure to fulfill a promise to pay for goods on credit is not fraudulent, so as to render a debt nondischargeable. *In re Salett*, 53 B.R. 925, 928 (Bankr.D.Mass.1985). However, when a debtor purchases goods on credit knowing he does not intend to pay for the goods or knowing he is unable to comply with the requirements of the contract, the debt may be nondischargeable. *Id.* at 928.

"Actual" fraud precluding discharge consists of any deceit, artifice, trick or design, involving the direct and active operations of the mind used to circumvent or cheat another; something said, done or omitted with the design of perpetrating what is known to be a cheat or deception. *In re Davis*, 11 B.R. 156, 158 (Bankr.D.Vt. 1980). However, fraud may consist of silence, concealment or intentional non-disclosure of a material fact, as well as affirmative misrepresentation of a material fact. *In re Slutzky*, 22 B.R. 270, 272 *supra; In re Frye*, 48 B.R. 422, 426 (Bankr.M.D.Ala. 1985); *In re Samford*, 39 B.R. 423, 427 (Bankr.M.D.Tenn.1984); *Matter of Weinstein*, 31 B.R. 804, 809 (Bankr.E.D.N.Y. 1983).

A "false pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation. *Matter of Weinstein*, 31 B.R. 804, 809, *supra.*

The finding of fact as to whether or not the Defendant had a fraudulent intention or scienter will obviously have to be determined by circumstantial evidence in most cases as direct evidence or the Defendant's state of mind at the time of the credit extension or the transfer of property or services is seldom expressly indicated. Although this is certainly a difficult task, it is no greater a task than any other cause of action that includes intent or state of mind as a necessary element. And the existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates he intended to deceive or cheat the creditor. *In re Fenninger*, 49 B.R. 307, 310, *supra; In re Taylor*, 49 B.R. 849, 851, *supra.* The Court may logically infer this intent not to pay from the relevant facts surrounding each particular case. *See, In re Kimzey*, 761 F.2d 421, 424, *supra.* And a persons intent, his state of mind, has been long recognized as capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact sufficient to support a fraud action. *In re Pannell*, 27 B.R. 298, 302 (Bankr.E.D.N.Y.1983). Questions of scienter are questions of fact. *Gabellini v. Swidler*, 724 F.2d 579, 11 B.C.D. 1017, 1018 (7th Cir.1984).

Howard, in its complaint filed June 16, 1983 at rhetorical paragraph four, asserts that by executing the mutual release on July 14, 1981, it believed that the obligations represented by the four checks had been satisfied in full by Schmidt, and that the inventory returned to Howard by Schmidt together with the two cashiers checks for $3,000. and $5500 were insufficient to cover the obligations represented by the checks. In addition, Howard asserts that it relied to its detriment on the representation by Schmidt that said checks were paid and thus accepted the inventory and the two cashiers checks in full satisfaction of all of Schmidt's obligations to Howard, and that Schmidt fraudulently induced Howard to execute the mutual release causing the Plaintiff to take another course of action other than what it would normally

pursue had it known of the alleged stop payment orders.

The Court sees the primary issue as assuming, *arguendo,* Schmidt had the requisite scienter by knowingly stopping payment on the four (4) checks immediately prior to or at approximately the same time the mutual release was executed, whether by virtue of this allegedly fraudulent conduct, Schmidt in fact contemporaneously obtained any money, property, services or an extension, renewal or refinancing of credit from Howard as the proximate result thereof.

Howard asserts that by virtue of the executing of the mutual release, it relinquished its right to proceed with legal action versus Schmidt for the monies due and owing for the sale of product under the original exclusive purchase contract, and this right to proceed with legal action on the indebtedness was a chose-in-action or an intangible property right that Howard relinquished as a result of Schmidt's allegedly fraudulent acts and as such is a property right obtained by Schmidt's fraud, citing *Neffle v. Neffle,* 483 N.E.2d 767, 771 (Ind.App.1985) where the Court of Appeals held that a chose-in-action is a personal right not reduced to possession but recoverable by suit in law and that it is a property right which in its broadest sense encompasses all rights of action whether they sound in contract or tort.

The crucial question is whether as a direct result of this allegedly fraudulent activity Schmidt contemporaneously obtained property or services of Howard or Howard extended credit to Schmidt.

■ To except a debt for property, services or credit from discharge, the money, property, services or credit must have actually been obtained by the debtor from the creditor as a *direct result* of the fraud. That is, a creditor must have given present consideration based on the false pretense, false representation or actual fraud. *Subsequent* conduct contrary to a former representation by the Debtor does not necessarily render the original representation to have been false. *In re Boese,* 8 B.R. 660,

662 (Bankr.D.S.Dak.1981). For example, a debt which is otherwise dischargeable does not become nondischargeable on the grounds of fraud because the debtor attempted to pay a debt by a check that was subsequently dishonored where the creditor sustains no loss by reason of the issuance of the check, and the debtor obtained no money, property or thing by reason of the issuance of the check. *In re Preston,* 47 B.R. 354, 357 (Bankr.E.D.Va. 1983). *See also,* 3 *Collier on Bankruptcy,* ¶ 523.08(1), p. 523–30 (L. King 15th Ed. 1986).

The Court is compelled to look at the nature of the underlying transactions that preceded and formed the basis for the mutual release to determine whether the obtaining of the mutual release itself was the obtaining of property by fraud.

There is no assertion made by Howard, nor was there any evidence adduced at the trial that any of the actual product itself that was purchased by Schmidt from Howard pursuant to the original Exclusive Purchase Contract, as orally modified, and which generally was the subject matter of the mutual release, was obtained by any fraudulent representation of Schmidt. That is, there is no evidence that at the time Schmidt originally obtained the product itself as represented by invoice 31134 referred to in check no. 818, dated July 10, 1981 in the sum of $4,770.18, and invoice 31253 referred to in check no. 827, dated July 13, 1981, in the sum of $578.00 that Schmidt had made any false representations contemporaneously therewith which were relied upon by movant and which caused Howard to sell that unspecified product to Schmidt, or that the above checks were fraudulently issued and/or stop pay orders were fraudulently made in order to obtain the product from Howard.

The mutual release does not refer specifically to the underlying sales transactions which led to the four checks on which payment was stopped nor do the four checks refer to the mutual release. The mutual release does not set out a dollar figure as to what was allegedly owed by

Schmidt to Howard and thus it does not set out the dollar value of the contract claims that were released by Howard as a result of the mutual release or whether Howard deemed any of the claims purportedly released as being tort claims for fraud.

If the bankruptcy had not intervened, Howard, would have had four separate causes of action at law for money damages versus Schmidt in the state court on the theory that the payment of the checks had been wrongfully stopped by Schmidt. These causes of action would not accrue to Howard until it had actual knowledge of the stop payment from Schmidt's bank and thus there is a substantial question as to whether the mutual release could have been raised as a defense to an action on these checks as the mutual release only released claims to the date thereof on July 14, 1981. In addition, Howard would have had the option to bring an action in the state court in equity to rescind or reform the mutual release for fraud in the inducement. If the rescission or reformation suit were successful, then Howard would have clearly had the right to proceed on the checks notwithstanding, a defense based on the mutual release. This however, would not have changed the nature of the underlying indebtedness and transformed the obligations from being *ex contractu* to *ex delicto*.

If the mutual release had not been executed and Schmidt had nevertheless issued the four checks in question and stopped payment on them as he did in this case, Howard would clearly have had four causes of action versus Schmidt at law for money damages as to those checks or the underlying debt which was to be paid for by the checks created pursuant to the Exclusive Purchase Agreement as modified. To these actions, Schmidt, of course, could raise any affirmative defense such as failure of consideration, etc. If the mutual release had not been executed and Howard had proceeded to a money judgment in the state court on the four checks and at that point Schmidt had filed bankruptcy, these money judgments would clearly have been dischargeable in bankruptcy subject, of course, to the right of Howard to object to their dischargeability on the grounds that any money, property, or services on extension of credit received contemporaneously for the checks was fraudulently obtained by Schmidt contrary to 11 U.S.C. § 523(a)(2)(A).

It thus appears that, assuming *arguendo,* Schmidt perpetrated a fraud on Howard by stopping payment on the four checks just prior to the execution of the mutual release without Howard's knowledge, when Howard had deemed the payment of these checks as part and parcel of the total settlement, the *most* that Schmidt might have obtained was the release of four unsecured money claims that were *in any event* dischargeable in bankruptcy unless Howard could show that as a direct result of the four checks upon which Schmidt stopped payment that Schmidt obtained money, property or services as a direct result thereof.

It appears to this Court that where a Debtor, such as Schmidt, by his conduct fraudulently induces a settlement agreement, the consideration received by the Debtor must have been the receipt of actual money or tangible property or services or the release of an underlying claim which is itself non-dischargeable, as a direct result of the fraud, and if all that was obtained by the Debtor was the release of a general, unsecured claim for monies due and owing which could have been discharged in bankruptcy notwithstanding the mutual release, then the Debtor has not received any property of the creditor. It is obvious that after the mutual release was executed, Schmidt was not precluded from filing bankruptcy and discharging any otherwise dischargeable claims that formed the basis of the mutual release.

It would seem that Howard should have filed its nondischargeability complaint as to the one or more of the underlying checks themselves for fraud and to rescind the mutual release for fraud in the inducement in anticipation that the mutual release would be raised as a defense thereto. By

proceeding on that theory, if Howard could have shown that Schmidt received money, property, services or credit for the checks in that they were fraudulently issued and/or stop payments thereon were fraudulently ordered. By proceeding in this fashion, the *underlying* obligations could have been held to be nondischargeable. This Howard did not do. It also noted that in its prayer for relief, Howard asks that the stay be vacated so that it may proceed with its suit in the Porter Superior Court to recover on the four "stop-pay" checks.

This Court pursuant to 11 U.S.C. § 523(c) has exclusive jurisdiction to determine the nondischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(A), and thus the Court cannot vacate the stay to permit Howard, under any circumstances, to litigate Schmidt's liability on the checks in the Porter Superior Court. This right to bring a nondischargeability complaint, based on the underlying transactions which formed the basis for the issuance of the checks themselves in this Court, was not precluded by the mutual release nor was Howard precluded from bringing a rescission or reformation suit in this Court as to the mutual release.

In the case of *In the Matter of Grubbs,* 7 B.R. 557 (Bankr.M.D.Ga.1980), aff'd. in part and rev'd. in part, 9 B.R. 499 (M.D.Ga.1981), the debtor persuaded the plaintiffs not to file liens promising to pay the plaintiffs at the closing.

The Bankruptcy Court determined the debts to be nondischargeable as *valid* liens would have resulted in payment to the Plaintiffs, stating:

> [S]ince valid materialman's liens on the properties would have insured payment to the plaintiffs, they have been damaged thereby in the amount stated.

*In the Matter of Grubbs,* 7 B.R. 557 at 599, *supra.*

However, the District Court reversed this portion of the decision stating:

> Section 523(a)(2)(A) prohibits discharge of only those debts which were obtained by false pretenses, false representation or actual fraud. In finding that the debt-

or obtained monies from the Beven Drive closing, the bankruptcy court misconstrued the intent of Section 523(a)(2)(A). *'Obtaining money' is capable of but one meaning, that is the direct transfer of money from a creditor to a debtor.* To reach a result such as the bankruptcy court did, would subject every little bankruptcy action to a nondischargeability claim under Section 523(a)(2)(A).

*In the Matter of Grubbs,* 9 B.R. 499 at 501, *supra.* (Emphasis supplied).

Not only did the District Court require a direct transfer of money from creditor to debtor to determine nondischargeability, the Court further found that debtor's conduct in persuading creditor to forego the filing of a materialman's lien did not violate Section 523(a)(2)(A). On this point, the Court stated:

> Nor can the court conclude that the debtor's ability to persuade the creditors to forego the filing of a materialman's lien by promising to pay the amounts due debtor (sic) at closing constitutes an extension, renewal or refinance of credit within the meaning of Section 523(a)(2)(A). Non-dischargeability is limited to credit extended in reliance upon a false statement.... In the instant case, Mr. Grubbs was extended no new credit ... based on his false representation that he would pay the debts at the closing ... [T]he fact that a materialman's lien was not filed does not constitute new consideration. Georgia courts have clearly placed the creditor on notice that the ninety day provision cannot be extended by the parties; *any failure on the part of a creditor to file a lien is the fault of that creditor.* While the court realizes that this result is inequitable, it is the better practice to timely file the lien and thereby avoid a subsequent swearing match with the debtor.

*Id.* at 501 (Emphasis supplied).

Although the facts of the above case are not on all fours with the case at bar, the analysis of the Court in that case is helpful. A close analysis of the transaction now before the Court leads this Court to the

conclusion that no matter how fraudulently devious and reprehensible the Debtor's conduct was in stopping payment on the four checks, and in persuading Howard to execute the mutual release and forego its rights to proceed to judgment on the contractual indebtedness then outstanding, there was no contemporaneous extension or renewal of credit extended by the Plaintiffs nor was there any contemporaneous transfer of property, services or money by the Plaintiffs to the Debtor at the time these allegedly fraudulent acts were committed. This, of course, is an indispensible element of the Plaintiff's claim of nondischargeability.

The original product sold by Howard to Schmidt was clearly sold and delivered by Howard to Schmidt on open account and upon a credit basis some time before the mutual release was executed. No assertion is made nor any evidence adduced by Howard that the product was *initially* obtained by the fraudulent acts of the Debtor. No security interest therein was retained by Howard and title thereto passed to Schmidt. Howard's theory of the case is not that Schmidt fraudulently did not intend to pay for the product at the time it was initially sold and delivered to the Debtor on credit, or that Schmidt fraudulently issued checks for the contemporaneous transfers of produce. Thus, the creation of the open account indebtedness for the product itself in the first instance cannot be held to be an operative fraudulent act that would lead to a finding of nondischargeability.

The Court believes this general settlement agreement must be distinguished from the one in *Greenberg v. Schools*, 711 F.2d 152 (11th Cir.1983), where the Court held that an obligation arising out of an agreement entered into in full settlement of a civil action involving a bankrupt's alleged fraud or defalcation is not discharged in bankruptcy where the settlement agreement extinguished the claims arising out of the actual fraud or defalcation. There the Court held that to determine the dischargeability of the settlement agreement inquiry was required into the factual circumstances behind the settlement agreement to determine whether the debt incurred was derived from fraudulent conduct that could not be discharged by the bankruptcy proceeding. *Citing, Fireman's Fund Insurance Company v. Covino*, 12 B.R. 876 (Bankr.M.D.Fla.1981). *See also, In re Rush*, 33 B.R. 97 (Bankr.D.Maine 1983), which held that a good faith settlement predicated on fraud does not extinguish the *underlying* fraud claims in a bankruptcy proceeding.

Thus, if in fact the mutual release itself, in the case *sub judice,* was expressly in settlement of a fraud claim that was not dischargeable in bankruptcy, the Court would be compelled to also hold the mutual release as nondischargeable. This, of course, is not the case.

The Court is cognizant that the facts in the case at bar are distinguishable from those in *Greenburg* and *Rush, supra,* in that Howard alleges fraud in the inducement as to the settlement agreement itself as opposed to asserting that the settlement agreement is based on the settlement of an underlying fraud claim that was not dischargeable in bankruptcy.

■ In the Court's opinion this is a crucial distinction. Inasmuch as the mutual release did not specifically settle an underlying fraud claim versus Schmidt which was not dischargeable in bankruptcy, the mutual release itself is a dischargeable obligation as well as any underlying debt that was the subject matter of that mutual release that was otherwise dischargeable in bankruptcy. The fact that the settlement agreement itself may have been induced by the fraudulent acts of Schmidt does not alter the result, in that Schmidt did not obtain the requisite property, services, money or credit or a renewal thereof as a result thereof.

■ It should also be noted that the mere forebearing of collection efforts does not constitute an extension of credit within the meaning of Section 523(a)(2)(A). *See, In Re Bacher*, 47 B.R. 825, 829 (Bankr.E.D. Pa.1985). *See also, In Re Colasante*, 12

B.R. 635, 638 (E.D.Penn.1981), where the Court held that the forebearance by a creditor to call demand notes is not considered an extension or renewal of credit.

Thus, the execution of the mutual release by Howard whereby it waived any and all rights to pursue the collection of the alleged indebtedness to it by Schmidt was not an extension, renewal or refinancing of credit within the meaning of 11 U.S.C. § 523(a)(2)(A). In fact, it was an attempt to completely extinguish all creditor-debtor relationships between the parties.

Wherefore, it is hereby, ORDERED, ADJUDGED, AND DECREED that the Plaintiffs take nothing by its complaint, that the Defendant have judgment of no and that the indebtedness of the Defendant to the Plaintiff is Dischargeable in the Defendant's bankruptcy.

The Clerk shall prepare a judgment on a separate document pursuant to Bankruptcy Rule 9021.