In re John R. **MATEYKO**, Debtor.

**ExpressDrop, Inc., Plaintiff,**

v.

**John R. Mateyko, and John R. Mateyko d/b/a EncoreDrop and Matey Corp., Defendants.**

**Bankruptcy No. 08–32684.**
**Adversary No. 09–00718.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Sept. 27, 2010.

Matthew J. Ryan, Franklin Park, IL, for Debtor.

---

## ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY

JACQUELINE P. COX, Bankruptcy Judge.

This matter comes before the court after a trial on the adversary complaint (the "Complaint") objecting to the discharge of a debt filed by plaintiff ExpressDrop, Inc. ("ExpressDrop" or the "Plaintiff") against defendants John R. Mateyko ("Mateyko") and Matey Corp. (together, the "Defendants"). Mateyko filed for relief under Chapter 7 of the Bankruptcy Code on November 28, 2008. He did business under the name EncoreDrop and is alleged to be the president and sole shareholder of Matey Corp.

The Complaint seeks a finding that the debt reflected by an agreed judgment order is not dischargeable under sections 523(a)(2)(A) and (a)(6) of the Code. 11 U.S.C. §§ 523(a)(2)(A), (a)(6). Count I alleges that Mateyko intended to deceive the Plaintiff through false statements and actions, rendering the debt excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). Count II seeks a determination that the debt owed by the Defendants to ExpressDrop is nondischargeable pursuant to 11 U.S.C. § 523(a)(6), which prohibits the discharge of a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6).

For the reasons set forth herein, the court holds that ExpressDrop has failed to establish by a preponderance of the evidence the elements required to except the debt from discharge under 11 U.S.C. § 523(a)(2)(A). The court finds, however, that ExpressDrop has demonstrated by a preponderance of the evidence that the debt arose from Mateyko's willful and malicious conduct resulting in injury to ExpressDrop's property.

## JURISDICTION

The court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334(a) and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (I), and (O).

## ANALYSIS

ExpressDrop alleges that it is an unsecured creditor of the Defendants because of acts resulting in the theft of both trade secrets and intellectual property. ExpressDrop also alleges that numerous false statements and promises made by Mateyko were designed to induce ExpressDrop to relinquish its rights and money.

ExpressDrop was a franchisor in the state of Illinois. It developed a proprietary system and business model that allowed customers to place and sell items on eBay (an Internet auction site) in exchange

for a commission and/or fee. This service was provided via ExpressDrop's website and through a network of stores owned by ExpressDrop and its authorized franchisees.

ExpressDrop proved at trial, by a preponderance of the evidence, that it spent a considerable amount of time, effort, and money to develop materials, information, business methods, technical knowledge, marketing concepts, trade secrets, client lists, commercial ideas, advertising materials, marketing strategies, information on sources of supply, administrative procedures, business forms, distinctive signs, trade dress, architectural designs, employee uniforms, and employee training techniques, all of which resulted in the creation of a proprietary system for the operation of its stores.

ExpressDrop also proved that it owned intellectual property rights, including the ExpressDrop trade name, trademark, related logo types, and a proprietary software system that was designed, developed, and implemented for ExpressDrop's exclusive use. The software integrated the entire scope of each transaction, from the first interaction with a customer to the completion of a sale, and provided the customer with an agreed upon portion of the proceeds from the sale of the item.

Franchisees were granted licenses to operate businesses using the ExpressDrop name, the proprietary materials, and information developed in accordance with a franchise agreement and an Operations Manual. Mateyko entered into a franchise agreement (the "Agreement") with ExpressDrop on August 21, 2006.

Section 4.1 of the Agreement included a provision that authorized the franchisee to use and display the franchisor's trademarks and to use its know-how and trade secrets, but only in the operation of the franchise business and subject to the terms of the Agreement.

Section 4.4 of the Agreement contained a confidentiality clause, which prohibited the franchisee from using, copying, or imitating any of the trademarks of ExpressDrop and from trading on ExpressDrop's goodwill. The provision also allowed ExpressDrop to obtain injunctions without having to post a bond.

Section 7.6 of the Agreement prohibited the franchisee from engaging in any trade, practice, or other activity harmful to the goodwill or reputation of the franchisor, or which would constitute deceptive or unfair competition.

Section 7.17 of the Agreement provided that the franchisee would not be allowed to use the franchise location for any purpose other than the operation of an ExpressDrop store.

Section 10.1 of the Agreement provided that the franchisee could terminate the Agreement only if each of the following conditions was met: 1) the franchisor committed a material breach of the Agreement; 2) written notice of said breach was provided to the franchisor; 3) the franchisor failed to cure the breach within at least sixty days after the delivery of written notice of said breach; and 4) ten days had passed since written notice of termination was delivered to the franchisor. In the event of termination, section 10.1 required the franchisee to return to the franchisor the Operations Manual and all other property of the franchisor.

Sections 13.1 and 13.2 of the Agreement provided that the franchisor could seek an injunction without posting a bond to prevent the occurrence of a threatened default or violation of the Agreement and that the franchisor could recover its costs and attorney's fees if it prevailed in an action to interpret or enforce the Agreement.

Section 20.1 of the Agreement contained a covenant not to compete provision, which prohibited the franchisee from engaging in, directly or indirectly, any business similar or substantially similar to an Express-Drop store within a twenty-five mile radius of the franchisee's territory during the life of the Agreement, three years, and for a period of two years thereafter.

Section 20.2 of the Agreement contained a nondisclosure clause, which prohibited the franchisee from disclosing any information concerning the methods of promotion, sale, or distribution used by the franchisor.

ExpressDrop proved at trial, by a preponderance of the evidence, that it conducted a training program for Mateyko and others employed by him and provided Mateyko with a copy of the Operations Manual before the franchise opened.

ExpressDrop also proved at trial that on January 16, 2007 Mateyko established an eBay user identification entitled "encoredrop" and that in February 2007, the Defendants began converting the Express-Drop franchise location, the business model, trade secrets, and other proprietary information owned and provided by ExpressDrop for their own personal use and for the use of a new competing business to be owned and operated by them. The Defendants operated the competing business, "EncoreDrop," from the franchise location with a website that allowed EncoreDrop to post items for sale on eBay utilizing the same or similar procedures used by ExpressDrop.

Competing against ExpressDrop, the Defendants accepted customers and placed items for sale on eBay, converting for their own use and gain the business methods, technical knowledge, marketing concepts, trade secrets, commercial ideas, information on sources of supply, and employee training techniques of ExpressDrop's sys-tem. The Defendants used the same phone number, commission policy, and business model that ExpressDrop used.

On February 20, 2007, Mateyko sent ExpressDrop an email message with the subject line "Written Notice–Termination of Franchise Agreement."

The Defendants removed the "Express" portion of the franchise's exterior "ExpressDrop" sign and replaced it with the word "Encore" so that the new sign read "EncoreDrop." The "EncoreDrop" sign used the "ExpressDrop" font, color, and logo. At trial, Mateyko did not dispute these facts in any material way. The Defendants did much the same to the store's interior signs.

Google offers a service through which its customers may arrange for their advertisements to appear on Google's website in response to a user's query. Specifically, Google's customers can select certain search terms which, if entered by a user, will return results that include a section called "Sponsored Links" at the top of the user's results page, highlighting the customer's website and advertising text. The Plaintiff alleges that the Defendants used the "ExpressDrop" name in its key word search for "EncoreDrop" and secured preferential status on that search engine as to those words.

ExpressDrop sought and obtained a temporary restraining order against the Defendants on March 12, 2007. Subsequently, there were numerous attempts to mediate the parties' disagreements. Those efforts resulted in a July 10, 2008 agreed judgment order. *See* Ex. F to Defendants' Motion for Summary Judgment, 09–00718, Docket No. 17. The agreed judgment order provided for payment of $85,000 to ExpressDrop in installments and rescinded an April 20, 2007 settlement agreement. *See* Ex. C to De-

fendants' Motion for Summary Judgment, 09–00718, Docket No. 17. That settlement agreement required the following: payment of $75,000 to ExpressDrop; mediation of disputes regarding it; rescission of the Agreement; a provision for the Defendants to resume operating EncoreDrop or any other business at the location in question; and waiver of ExpressDrop's interest in EncoreDrop. In addition, until the settlement amount was paid, the Defendants were not to engage in an "eBay" drop store or auction business within a one-mile radius of ExpressDrop's location at 1900 W. Belmont Avenue, Chicago, Illinois; ExpressDrop's Operations Manual and business forms were to be returned; Matey Corp. was to keep all commissions for items that were received during a certain period of time; and the Defendants were not to infringe on the registered trademark "ExpressDrop" or use ExpressDrop's registration form or consignment agreement. The settlement agreement also allowed the Defendants to continue to use the exterior EncoreDrop sign. None of the installment payments were made.

Mateyko was held in contempt of court on November 21, 2008. He filed for bankruptcy relief under Chapter 7 of the Bankruptcy Code on November 28, 2008.

### Count I

To recover under section 523(a)(2)(A), a creditor must establish that a debtor secured "money, property, services, or an extension, renewal, or refinancing of credit" by "false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). ExpressDrop posits that it was continuously mislead and lied to throughout its dealings with Mateyko. The Plaintiff also alleges that its time and money were wasted thereby. The problem with its argument, however, is that ExpressDrop has not established that the Defendants procured money, property, services, or an extension, renewal, or refinancing of credit through false pretenses, a false representation, or actual fraud.

ExpressDrop contends that entering the settlement agreement ultimately gave Mateyko a release, which is equivalent to money, property, services, or an extension, renewal, or refinancing of credit. The Defendants disagree, arguing that a release under these circumstances does not constitute the giving of money, property, services, or an extension, renewal, or refinancing of credit. In *Howard & Sons, Inc. v. Schmidt (In re Schmidt)*, 70 B.R. 634, 642 (Bankr.N.D.Ind.1986), the court noted: "It appears to this Court that where a Debtor, such as Schmidt, by his conduct fraudulently induces a settlement agreement, the consideration received by the Debtor must have been the receipt of actual money or tangible property or services or the release of an underlying claim which is itself non-dischargeable, as a direct result of the fraud, and if all that was obtained by the Debtor was the release of a general, unsecured claim for monies due and owing which could have been discharged in bankruptcy notwithstanding the mutual release, then the Debtor has not received any property of the creditor."

The Defendants breached the Agreement by operating a competing business in the franchise location; by usurping and imitating ExpressDrop's signage in violation of the confidentiality clause in section 4.4; and by using the franchise location for a purpose other than the operation of an ExpressDrop franchise in violation of section 7.17.

ExpressDrop argues that through the 2007 settlement agreement, the Defendants received more than a release of underlying nondischargeable claims; that agreement allowed the Defendants to continue to use the exterior sign; to keep certain commission payments; to resume

the EncoreDrop business at the franchise location; and to retain the use of client lists and the proprietary software. These valuable concessions reflect ExpressDrop's intellectual property, trademarks, and trade secrets, which were the heart of its business.

ExpressDrop is correct. The Defendants got more than the release of a general, unsecured claim for monies owing which could have been discharged in bankruptcy.

■ The Defendants argue that the original Agreement merged into the subsequent agreements, prohibiting ExpressDrop from excepting a debt from discharge for actual fraud, false pretenses, false representations or for willful and malicious conduct regarding the circumstances surrounding the original Agreement.

To hold that ExpressDrop cannot now seek exceptions to discharge under section 523 of the Bankruptcy Code based on Mateyko's fraudulent or willful and malicious conduct regarding the entire course of events herein would undermine efforts to settle cases, an important goal of our justice system. Such a holding would cause creditors to avoid settling cases for fear of not being allowed to pursue section 523 actions regarding the circumstances surrounding the original debt. Debtors would be eager to settle debts incurred fraudulently and later breach the settlement agreements without the threat of section 523 actions. The court rejects the Defendants' merger and estoppel argument, finding that it is offensive to public policy which encourages settlements.

In addition, case law holds that the merger of a claim into a judgment does not change its nature as far as its provability in bankruptcy is concerned. *Pepper v. Litton (In re Dixie Splint Coal Co.),* 308 U.S. 295, 305, 60 S.Ct. 238, 84 L.Ed. 281

(1939). ExpressDrop is allowed, for section 523 purposes, to look at the underlying circumstances of the debt from its inception, not just the circumstances surrounding the settlement of the original debt.

■ An examination of the entire record herein reveals that ExpressDrop has not established that the Defendants made specific statements constituting false pretenses, false representations, or actual fraud in order to obtain the debt in issue. The Complaint merely alleges that the Defendants frustrated ExpressDrop's efforts to arrange mediation sessions and delayed the state court proceedings, which, when considered with all of Mateyko's conduct, amounted to fraud. None of that behavior constitutes false pretenses, false representations, or actual fraud. In *Fuda v. D'Atria (In re D'Atria),* 128 B.R. 71 (Bankr. S.D.N.Y.1991), the court held that "[t]he debtor's failure to honor his obligations under the written Agreement between the parties, which was incorporated in a final judgment of divorce, without more, does not mean that the plaintiff was fraudulently induced to enter into the Agreement or that the debtor had fraudulently intended not to honor his obligations when he signed the [A]greement. A breach of contract is not tantamount to fraud." *Id.* at 76. ExpressDrop contends that Mateyko's subsequent failure to honor his obligations is proof that he never intended to honor those obligations. Like the plaintiff in *D'Atria,* ExpressDrop has not shown more than a failure to make payments, which does not amount to fraud for purposes of section 523(a)(2)(A).

The court enters judgment against the Plaintiff ExpressDrop, Inc. and in favor of the Defendants John R. Mateyko and Matey Corp. on Count I.

## Count II

Count II alleges that Mateyko's statements and actions resulting in the Plaintiff relinquishing significant legal rights, forgoing money, and suffering severe injury were willful and malicious and without just cause or excuse. The Plaintiff contends that the debt at issue is therefore not dischargeable under section 523(a)(6), which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]" 11 U.S.C. § 523(a)(6).

A creditor seeking to except a debt from discharge under section 523(a)(6) must establish that: (1) the debtor's actions caused injury to the creditor's person or property; (2) the debtor's actions were willful; and (3) the debtor's actions were malicious. *Cutler v. Lazzara (In re Lazzara)*, 287 B.R. 714, 722 (Bankr. N.D.Ill.2002). All three elements must by established by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

In 1998, the United States Supreme Court ruled in *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), that the word "willful" in section 523(a)(6) modifies the word "injury," indicating that "nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Id.* at 61, 118 S.Ct. 974. *Geiger* has been interpreted to mean that it is not enough that there be a deliberate or intentional act leading to injury, but that nondischargeability requires that the injury itself be deliberate or intentional. *Lazzara*, 287 B.R. at 723; *Fid. Fin. Servs. v. Cox (In re Cox)*, 243 B.R. 713, 717–18 (Bankr.N.D.Ill.2000).

Mateyko testified herein that he has a securities license which allows him to sell investments to the public. Transcript of July 28, 2010 trial ("Transcript"), p. 39. He has been employed in the past at U.S. Bank and at J.P. Morgan Chase. Transcript, pp. 39–40. Mateyko admitted that he received ExpressDrop's software, training, Operations Manual, and exclusive rights to operate from the store in question. Transcript, pp. 48–52. He also admitted that he set up a competing business less than four months into the three-year contract. Transcript, pp. 52–53. Additionally, he conceded that he conducted business through EncoreDrop from the same location at which he had been authorized to operate ExpressDrop, using the same color scheme and the same phone number. Transcript, p. 66. Mateyko admitted that he altered the ExpressDrop sign by eliminating the "Express" portion of it and replacing it with the word "Encore" to form the EncoreDrop sign. Transcript, pp. 67–68. He also acknowledged that he set up the EncoreDrop website and changed his eBay user name to EncoreDrop. Transcript, pp. 52, 55. Mateyko claimed that he sold only three items as the EncoreDrop entity. His credibility, however, was effectively challenged on this issue. He later admitted to selling at least six items as EncoreDrop. Transcript, pp. 56–57. At one point, he said that he used the same fee structure as ExpressDrop. Transcript, p. 69. He later conceded that he used a different price structure. Transcript, p. 201.

Mateyko candidly admitted to being aware of the Agreement's non-compete provisions. However, that did not stop him from creating EncoreDrop to engage in the same business as ExpressDrop. Transcript, pp. 59–60, 63. He claimed that he did so because ExpressDrop was in breach of the Agreement. Transcript, p. 60. He has not, however, counterclaimed on that basis. Mateyko even admitted

having money to make the payments required by the settlement agreement. Transcript, p. 87. Nevertheless, no payments were ever made. He later claimed that the money in his accounts was not available, as he had to use it to pay his customers and his attorney for legal fees. Transcript, pp. 114, 135. However, Mateyko never presented evidence that those funds were disbursed to his customers and his attorney. He admitted changing banks so that the Plaintiff could not garnish his accounts. Transcript, p. 116.

It is clear that Mateyko acted intentionally in conducting a competing business. The issue is whether he intended the injury that resulted. He was asked at trial about his deposition testimony. He was asked: "Did you?" He answered: "Seriously, I put myself in bankruptcy to spite your clients rather than work out terms that we could all come to an agreement with. I don't like your clients, Nick. I don't even like you." He was also asked: "Mr. Mateyko, you stated at your deposition, 'I don't like your clients, Nick,' didn't you?" His answer: "Yeah, it appears that I did." Transcript, pp. 138–139. His dislike of the plaintiff appears to be the motivating force behind the intentional injury.

Tom Bruno ("Bruno"), one of Express-Drop's former owners, testified on behalf of the Plaintiff. Transcript, p. 156. Specifically, he testified that on February 14, 2007, he spoke with Mateyko who told him that he wanted to break the Agreement and that he knew he could get away with it even though a mutual separation was called for by the terms of the Agreement. According to Bruno, Mateyko thought that the Plaintiff was trying to sell the business at the time and that ExpressDrop would not pursue him in court. Mateyko knew that his deliberately willful conduct would jeopardize ExpressDrop's efforts to operate and sell its business. This statement,

coupled with Mateyko's open and unjustified breaches of the Agreement in operating a business that competed directly with ExpressDrop, supports a finding that he engaged in willful and malicious conduct, intentionally causing injury to the Plaintiff. Section 20.1 of the Agreement required that he not operate a competing concern even after termination of the Agreement. Despite the provision, he operated a competing concern in the face of this clear prohibition. Mateyko's actions speak volumes about his intent. His conduct led to the Plaintiff's demise. Its time and resources were spent challenging Mateyko's conduct. In fact, ExpressDrop claims to have lost its business as a result of Mateyko's conduct; it lost focus and had to pay legal fees to address that conduct.

According to Bruno, ExpressDrop ultimately decided to close its doors because of the situation. Transcript, p. 176. The court believes Bruno's testimony.

As an experienced financial professional, Mateyko knew that operating a competing concern in violation of the Agreement so soon after executing it would result in financial harm to the Plaintiff. His February 14, 2007 statement to Bruno shows that he knew that ExpressDrop was vulnerable. He openly violated the Agreement because he thought that the Plaintiff's principals were more concerned with operating the business than in suing him.

He did not follow the Agreement's termination procedure set out therein at section 10.1.

An injury is willful and malicious within the meaning of section 523(a)(6) where there is either an objective certainty of harm or a subjective motive to cause harm. *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir.1998). Mateyko's actions were objectively and substantially certain to harm ExpressDrop, and,

**322**

as a result, his debt to ExpressDrop is not dischargeable under 11 U.S.C. § 523(a)(6).

Mateyko's conduct herein is similar to the conduct complained of in *Honey Dew Associates, Inc. v. Monaco (In re Monaco)*, 347 B.R. 454, 458 (Bankr.D.Mass. 2006). In that case, the court denied a motion to dismiss a complaint where the debtors, a married couple who had been a creditor's franchisees, set up another business, and operated it out of the same location as their coffee and donut shop franchise in an attempt to divert gross income from the franchise and thus lower their franchise fee. The court found that facts asserting diversion of assets and under-reporting of sales were sufficient to state a cause of action to except a debt from discharge for willful and malicious injury under section 523(a)(6). *Id.* at 459. Likewise, the diversion of assets established herein, along with the other proven breaches, supports this court's finding that Mateyko willfully and maliciously injured ExpressDrop.

The court enters judgment in favor of the Plaintiff ExpressDrop, Inc. and against Defendants John R. Mateyko and Matey Corp. on Count II. John R. Mateyko's debt to ExpressDrop, Inc. is not dischargeable, as John R. Mateyko willfully and maliciously caused injury to the property of ExpressDrop, Inc. The Defendants John R. Mateyko and Matey Corp. are liable to the Plaintiff ExpressDrop, Inc. for $85,000 and attorney's fees.

The Plaintiff ExpressDrop, Inc. may petition the court for attorney's fees on or before October 19, 2010.