In re Mark KRESSNER, Debtor.

Hilda GORE, Executrix of the Estate of Bernard Gore, Deceased, Plaintiff,

v.

Mark KRESSNER, Defendant.

Bankruptcy No. 91–B–21431 (JJC).
Adv. No. 93–5045A.

United States Bankruptcy Court,
S. D. New York.

Feb. 12, 1997.

---

Mark Kressner, Pound Ridge, NY, Debtor–Defendant, pro se.

Holm, Krisel & O'Hara by Andrew M. Krisel, New York City, for Plaintiff.

*DECISION AND ORDER DENYING EX-CEPTIONS FROM DISCHARGE UNDER 11 U.S.C. § 523(a)(2)(A) AND (a)(4) OVERRULING OBJECTIONS TO DEBTOR'S DISCHARGE UNDER 11 U.S.C. § 727(a)(3), (4)(A), (6)(A) AND (C)*

JOHN J. CONNELLY, Bankruptcy Judge.

Creditor Hilda Gore, executrix of the Estate of Bernard Gore ("Plaintiff"), commenced this adversary proceeding [1] seeking judgment declaring her $506.938.07 claim arising from a State Court judgment against debtor Mark Kressner ("Kressner" or "Defendant") non-dischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(4) and to deny the debtor's discharge pursuant to 11 U.S.C. § 727(a)(3), (4) and (6).[2]

### Factual Background

In order to fully understand the matter at hand, the Court must step back and consider all the events transpiring at the times in question. The chapter 7 debtor-defendant in this adversary proceeding was a practicing attorney specializing in negligence and medical malpractice cases in New York State since 1976. Defendant was suspended from the practice of law in 1985 and has since been reinstated as a practicing attorney.

The deceased, Bernard Gore ("Gore"), was an attorney who practiced law in New York State from 1935 until his death in 1982.

In the early 1980's, as Gore's health deteriorated, he began referring negligence and medical malpractice cases to Defendant who agreed to share the net fee earned equally with Gore. While Defendant paid Gore a referral fee in connection with most of the cases, Defendant did not split the fees with Gore in some of the referred cases. One such case was a medical malpractice matter entitled *Newman v. City of New York* (here-inafter the "Newman Matter"), although Debtor and Gore both signed a written agreement that they would share the fees earned in the Newman Matter on a 50–50 basis. (Plaintiff's Exhibit F; Trial Transcript ("Tr.") at 154–55). The record shows that Gore referred the Newman Matter to Kressner, and during the pendency of the case, Gore became seriously ill.

Gore died in 1982. Shortly after the funeral, Gore's son, Nelson Gore, and daughter, Hilda Gore, met with Kressner to discuss his fee-splitting arrangement with their father. (Tr. at 26). Because he was under investigation by the Professional Disciplinary Committee at that time,[3] Kressner told Gore's children he could not continue with the fee-splitting arrangement, asserting that he could uphold the arrangement only for cases on which Gore actually performed work. (Tr. at 27–28). One outcome of this meeting was to put Defendant on notice, as early as 1982, that Gore's heirs claimed entitlement to fifty percent of the fees Defendant received from the referred cases. Indeed such was the arrangement because part of the record before this Court shows that Defendant did pay money over to the estate on many of the referred cases. These payments are an acknowledgment by Kressner that he did in fact have a 50–50 split fee agreement with Gore. Nevertheless, he did make an exception for the fees received on the Newman Matter and several others. Kressner justifies his actions by asserting that Gore's activity on the Newman Matter was limited to opening the file, conducting an interview of one of the plaintiffs and ensuring the retainer agreement was executed and filed. He further contends that because Gore was deceased and obviously could not do any work on the case going forward. Gore's estate is not entitled to the fees sought.

---

1. This Court has jurisdiction over this core proceeding under 28 U.S.C. § 1334(b) and 157(b)(2)(I) and (J).

2. Unless otherwise indicated, all statutory references are to Title 11 of the United States Code.

3. Defendant ultimately pled guilty to an unclassified misdemeanor, soliciting business on behalf of an attorney, a violation of Judiciary Law Section 479. By order of the Supreme Court of the State of New York, Appellate Division, First Department, dated May 16, 1985 and amended by order of said court dated June 27, 1985, Defendant was suspended from the practice of law for a period of three years and until further order of that court.

Approximately two years after the meeting between the Defendant and Gore's children, a structured settlement of the Newman Matter was reached in March, 1984. The settlement: provided, *inter alia*, for the City of New York to take care of both Mr. and Mrs. Newman (both of whom had become incompetent) for the rest of their lives. In addition, the structured settlement provided for the payment by the City to the Newmans' guardian of $250,000 and a stipulated attorneys' fee in the amount of $700,000. These funds were placed into the Defendant's attorney-escrow account, pursuant to the Professional Rules of Conduct, requiring him to escrow the money received from the settlement, for the benefit of all parties who were entitled to said funds.[4] In March 1984, in furtherance of the stipulated settlement, Defendant disbursed the $950,000 from his escrow account by issuing a $250,000 check payable to the Newmans' guardian ad litem and a $700,000 check payable to himself as and for attorneys' fees. Defendant deposited the $700,000 check in his own personal bank account.

As a result of the Debtor's failure to divide the fees, Plaintiff commenced an action in the Supreme Court, New York County entitled *Gore v. Kressner* seeking a determination that the agreement entered into between Gore and the Defendant was valid and enforceable. Plaintiff alleged two causes of action; one sounding in contract and the other for fraud to recover one-half of the unpaid fees on several of the referred cases. On December 30, 1988, the Honorable James N. White, rendered a written decision (the "State Court Decision"), ruling that the agreements to divide legal fees were valid and enforceable because Gore, as the referring attorney, had contributed sufficient work and/or services on the cases in question to uphold the fee-splitting agreements. The Court found that Defendant was liable on the contracts to Gore in the total amount of $507,938.07, allocated as follows: the sum of

$350,000 with interest from March 26, 1984 regarding the Newman Matter; the sum of $500 with interest from January 11, 1983 regarding a matter entitled *McNamara v. Shivers;* the sum of $3,704.05 with interest from November 23, 1982 regarding a matter entitled *Saperstein v. Mt. Vernon Board of Education;* and the sum of $688.33 with interest from November 9, 1992 regarding a matter entitled *Kerr v. Matteo.* The State Court Decision also dismissed Plaintiff's second cause of action for fraud[5] and dismissed all three of Defendant's counterclaims. The judgment reflecting the State Court Decision was entered by the clerk of the Supreme Court, County of New York, on March 29, 1989. The Appellate Division, First Department affirmed the judgment in January, 1990 in an opinion which stated Bernard Gore had provided sufficient services to justify the judgment in favor of Plaintiff's decedent. *See Gore v. Kressner,* 157 A.D.2d 575, 550 N.Y.S.2d 319 (1st Dept.1990).

### The Bankruptcy Proceedings

On September 16, 1991, Defendant filed a voluntary petition in this Court for relief under Chapter 7 of the United States Bankruptcy Code, listing Plaintiff as a creditor. By reason of numerous extensions to file a complaint objecting to discharge, requested by Gore and agreed to by Kressner, the time to object to the liability of the debt owing to Plaintiff and to object to the Debtor's discharge was extended through February 2, 1993. Plaintiff commenced this adversary proceeding by filing a summons and a complaint on February 2, 1993. Thereafter on March 6, 1993, Defendant filed a motion for summary judgment seeking dismissal of the complaint. On May 25, 1993, the late Honorable Howard Schwartzberg rendered a written decision denying the Defendant's summary judgment motion. *See In re Kressner,* 155 B.R. 68 (Bankr.S.D.N.Y.1993). Defendant then filed his answer, wherein he asserted five counterclaims. Plaintiff moved to

---

**4.** Disciplinary Rule 9–102(A) of the New York Lawyers Code of Professional Responsibility provides that a lawyer in possession of funds or other property belonging to another person, where such possession is incident to his or her practice of law, is a fiduciary.

**5.** The State Court dismissed the fraud claim since it concluded that "fraud is not an available remedy where the claim is that the defendant entered into a contract with no intention of performing it." *Gore v. Kressner,* No. 84–5825 at 3 (N.Y. Dec. 30, 1988).

dismiss all counterclaims for failure to state a cause of action. pursuant to Federal Rule of Civil Procedure 12(b)(6), which motion was granted by Judge Schwartzberg on September 29, 1993. *See In re Kressner,* 159 B.R. 428 (Bankr.S.D.N.Y.1993).

Plaintiff's adversary complaint asserts six causes of action against the Debtor–Defendant. Plaintiff moved for partial summary judgment under Section 523(a)(4), and the motion was denied in a written decision by Judge Schwartzberg dated February 18, 1994. *See In re Kressner,* 164 B.R. 235 (Bankr.S.D.N.Y.1994). In the decision, Judge Schwartzberg held that the mere fact that attorneys had entered into a valid fee-splitting agreement was not sufficient to show the existence of a joint venture between them under New York law, or to establish that they stood in a fiduciary relationship within the meaning of Section 523(a)(4). On November 2, 1994, the matter came on for trial.

### DISCUSSION

***The First Cause of Action: Section 523(a)(2)(A)***

 In the First Cause of Action, Plaintiff seeks a declaration' that her claim is non-dischargeable under section 523(a)(2)(A), which excludes from discharge any debt:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement in writing respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A).

To sustain a cause of action under this section, Plaintiff must establish by a preponderance of the evidence that Kressner: (1) made false representations, (2) which he knew were false at the time they were made, (3) which were made with the intent to deceive, (4) upon which Plaintiff relied, and (5) which reliance caused Plaintiff to suffer a loss. *In re Guerrerio,* 143 B.R. 605, 611 (Bankr. S.D.N.Y.1992); *accord In re Jacone,* 156 B.R. 740, 743–4 (Bankr.S.D.N.Y.1993); *Kressner,* 155 B.R. at 72. The failure ·to prove any of these elements is fatal to Plaintiff's case. *See In re Gans,* 75 B.R. 474, 486 (Bankr.S.D.N.Y.1987). If Plaintiff proves a prima facie case under Section 523(a)(2)(A), the burden then shifts to Defendant to prove his defense. *See Newmark,* 20 B.R. at 853; *Carini v. Matera,* 592 F.2d 378, 380–81 (7th Cir.1979).[6]

---

**6.** Plaintiff contends that Defendant is collaterally estopped in this action from denying that the debt, consisting of the monies obtained by Defendant from cases referred to him by Gore, is excepted from discharge. Plaintiff urges that at the outset, a joint venture existed between Gore and Defendant and argues that the New York Supreme Court's findings should be given collateral estoppel effect. The record must be clear that the State Court did not find the existence of a joint venture between Defendant and Gore. Plaintiff contends that since Judge White, in his written opinion, specifically found that Gore performed services on the cases at issue, and that the agreement to share the fee equally was valid and enforceable, collateral estoppel therefore applies. However, this Court, while mindful of the issues decided by the State Court, must take a step beyond that court's findings to determine the dischargeability issues herein.

The doctrine of collateral estoppel prevents a party from re-litigating an issue clearly raised in prior action and necessarily decided against that party or those with whom the party shares privity. *Conte v. Justice,* 996 F.2d 1398, 1400 (2d Cir.1993); *accord In re Gottheiner,* 703 F.2d 1136, 1139 (9th Cir.1983). The adjudication of fact must be by a valid and final judgment. *In re*

*Kelly,* 155 B.R. 75, 78 (Bankr.S.D.N.Y.1993). For purposes of collateral estoppel, the term final judgment includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect. *Id.* (*citing* Restatement (Second) of Judgments § 13 (1980)). The doctrine of collateral estoppel is applicable to bankruptcy cases in general and to dischargeability proceedings in particular. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). The United States Supreme Court has found that if the requirements of collateral estoppel are met, re-litigation of the factual issues underlying a determination of non-dischargeability is barred. *Id.* at 284–85 n. 11, 111 S.Ct. at 658–59 n. 11; *Kelly v. Robinson,* 479 U.S. 36, 48 n. 8, 107 S.Ct. 353, 360 n. 8, 93 L.Ed.2d 216 (1986); *Brown v. Felsen,* 442 U.S. 127, 139 n. 10, 99 S.Ct. 2205, 2213 n. 10, 60 L.Ed.2d 767 (1979); *In re Horst,* 151 B.R. 563, 565 (Bankr.D.Kan.1993); *accord Guerrerio,* 143 B.R. at 610.

The elements of the test for application of collateral estoppel are: (1) whether the issue sought to be litigated is identical to an issue necessarily decided in the prior action and decisive on the present action, and (2) whether the

Executrix Hilda Gore alleges that subsequent to the entry of the State Court judgment, Kressner made representations regarding the debt with the intention and purpose of deceiving her, and Kressner's statements induced her to forbear from exercising her rights as executrix of Gore's estate under the judgment. The record reflects that Kressner told Hilda Gore and Nelson Gore (collectively, the "Gores") that whenever a case that was part of the arrangement between Kressner and Gore was settled and fees received, Kressner would send the Gores a check for their portion of said fees and a closing statement. (Tr. at 29). Plaintiff-executrix has failed to show that Defendant acted intentionally to deceive her. Moreover, Plaintiff's allegation that Kressner's statements induced her to forbear from exercising her rights under the judgment is clearly refuted by Plaintiff's own testimony that Kressner told her that what she thought was an agreement was not going to be honored. (Tr. at 29–32). Additionally, Nelson Gore testified that he was looking for reassurance from Debtor about the agreement on the fees and he came away feeling like he was not reassured. (Tr. at 50–51). Hilda Gore also admits that she hired an attorney, Jerome Berkowitz, who pursued post-judgment discovery and enforcement of the money judgment against Debtor.

█ More importantly, Plaintiff has lost sight of the critical point at issue, specifically, whatever Kressner may have or did in fact say to Hilda Gore has nothing to do with the creation of the debt herein. *See In re Schmidt,* 70 B.R. 634 (Bankr.N.D.Ind.1986) (mere forebearing of collection efforts does not constitute extension of credit within meaning of Bankruptcy Code governing non-dischargeability on the basis of fraud). In the instant case, the debt arose out of exchanges between the deceased Gore and Debtor. In fact, in the portion of the complaint referrable to Section 523(a)(2)(A), the Plaintiff has alleged: "[a]ll monies obtained by defendant from cases referred to him by plaintiff were obtained by defendant by false pretenses, false representations or actual fraud." (Complaint at p. 6). It is undisputed that all monies ever obtained "from cases" can only mean the referral of cases from Bernard Gore, the decedent, and the fees generated therefrom. There is nothing that was ever referred by Hilda Gore and no monies ever obtained by her. Thus, there was no contemporaneous extension or renewal of credit extended by the Plaintiff nor was there any contemporaneous transfer of property, services or money by the Plaintiff to the Debtor at the time these allegedly fraudulent acts were committed. This, of course, is an indispensable element of the Plaintiff's claim of non-dischargeability. *See Schmidt, supra.*

█ Significantly, Judge Schwartzberg concluded that *res judicata* bars the Plaintiff from asserting an action against Kressner for fraudulently inducing Bernard Gore to enter into the fee-splitting agreement because this issue was already actually litigated in the State Court. *Kressner,* 155 B.R. at 73. As to any alleged fraud or false representations made to Hilda Gore, which clearly arose subsequent to the creation of the debt between Bernard Gore and Kressner, they are outside the bounds of the statute. Even if this was not the case, the aforementioned facts and testimony show that Plaintiff was not fooled into any false reliance by any statement by Kressner resulting in Plaintiff suffering a loss.

Finally, even if the Court were to adopt Hilda Gore's allegation that Kressner's false statements induced her to forebear from ex-

---

party to be bound had a full and fair opportunity to contest the determination now said to control. Conte, 996 F.2d at 1400; *accord Long Island Lighting Co. v. Imo Industries, Inc.,* 6 F.3d 876, 885 (2d Cir.1993): *Gottheiner,* 703 F.2d at 1139. The proponent has the burden of pinpointing the exact issues litigated in the prior action and establishing a record sufficient to reveal the controlling facts. *In re Spector,* 22 B.R. 226, 231 (Bankr.N.D.N.Y.1982), *citing Hernandez v. City of Los Angeles,* 624 F.2d 935, 937 (9th Cir.1980).

The pre-bankruptcy judgment is res judicata on the issue of liability but not on the issue of dischargeability which is a new and different cause of action to be decided in a proceeding before this Court under Section 523 of the Code. It is the law of this case that said cause of action is not barred by res judicata or collateral estoppel. *See Kressner,* 155 B.R. at 73. From the record that is before this Court, the facts sought to be precluded were not actually litigated by Kressner.

ercising her rights under the judgment, which is wholly contrary to the evidence adduced at trial, Plaintiff still has failed to prove a cause of action under Section 523(a)(2). As Judge Schwartzberg concluded in *Kressner,* since the issue of whether the Debtor fraudulently induced Gore to enter into the fee-splitting agreement was already litigated in the State Court, *res judicata* bars the Plaintiff from reasserting this fraud claim. *Kressner,* 155 B.R. at 73. Therefore, the underlying judgment of liability against Kressner for breach of contract, without more, is a dischargeable debt. Consequently, as to any subsequent alleged misrepresentations which caused the Plaintiff to forebear from exercising her rights under the judgment, all that could have been obtained by the Debtor was the postponement of the enforcement of a judgment, dischargeable in bankruptcy.

An analogous situation occurred in *In re Schmidt, supra,* wherein that Court concluded that the fact that the settlement agreement itself may have been induced by fraudulent acts of the debtor did not render the debt non-dischargeable, where the mutual release in the settlement agreement settled a dischargeable claim. As the Court concluded in *Schmidt:*

> It appears to this Court that where a Debtor, such as Schmidt, by his conduct fraudulently induces a settlement agreement, the consideration received by the Debtor must have been the receipt of actual money or tangible property or services or the release of an underlying claim which is itself non-dischargeable, as a direct result of the fraud, and if all that was obtained by the Debtor was the release of a general, unsecured claim for monies due and owing which could have been discharged in bankruptcy notwithstanding the mutual release, then the Debtor has not received any property of the creditor. It is obvious that after the mutual release was executed, Schmidt was not precluded from filing bankruptcy and discharging any otherwise dischargeable claims that formed the basis of the mutual release.

*In re Schmidt,* 70 B.R. at 642.

Similarly, in the instant case, the Debtor did not receive actual money or tangible property or services or the release of an underlying claim which is itself non-dischargeable, as a direct result of the fraud. The underlying judgment of liability against Kressner recognizes nothing more than a breach of contract, a dischargeable debt. Any alleged forebearing of collection efforts of an underlying dischargeable claim by Hilda Gore does not constitute the extension of credit or the receipt of property or money within the meaning of the Bankruptcy Code governing non-dischargeability on the basis of fraud. *See In re Bacher,* 47 B.R. 825, 829 (Bankr.E.D.Pa.1985). Therefore, Plaintiff has failed to prove a prima facie case under Section 523(a)(2)(A).

### The Second and Third Causes of Action: Section 523(a)(4)

In the Second and Third Causes of Action, Plaintiff seeks a declaration that her claim is non-dischargeable under Section 523(a)(4) which excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). Plaintiff claims Defendant fraudulently misappropriated funds that he was obliged to tender to Gore under the fee-splitting agreement. Plaintiff further alleges that Kressner embezzled the funds while he acted as a fiduciary. The premise of Plaintiff's allegations is that the relationship between Gore and the Debtor constituted a joint venture, which therefore established that the Debtor acted in a fiduciary capacity. Debtor argues that no such relationship has been established because the fee-splitting agreement was only a contract that does not impose fiduciary duties upon him.

For Plaintiff to prevail on her Second Cause of Action, it must be initially established that the Defendant acted in a fiduciary capacity. *Teichman v. Teichman (In re Teichman),* 774 F.2d 1395, 1398 (9th Cir. 1985); *In re Balzano,* 127 B.R. 524, 532 (Bankr.E.D.N.Y.1991): *In re Richey,* 103 B.R. 25, 31 (Bankr.D.Conn.1989); *In re Kaufman,* 85 B.R. 706, 710 (Bankr.S.D.N.Y. 1988). Plaintiff must show that the debt owed by Defendant to Plaintiff from the referred cases are debts for fraud or defalca-

tion by Defendant while acting in a fiduciary capacity as the attorney and escrow agent for Plaintiff. Plaintiff cites the Court to the case of *In re Garver,* 180 B.R. 181 (Bankr. N.D.Ohio 1995) to support her contention that the attorney relationship herein must be characterized as an "express or technical" trust, as required by Section 523(a)(4) to prevent discharge, thus establishing a fiduciary relationship. The Court disagrees and finds the facts in *Garver,* involving an attorney-client relationship, to be uninstructive. In the case at bar, this Court is dealing with the relationship between a referring attorney and a receiving attorney; in *Garver,* the Court was dealing with the relationship between an attorney and his client. The duties imposed on the parties in these two types of relationships differ substantially.

▮ Plaintiff contends that the fee-splitting agreement was a joint venture agreement. In that regard, Plaintiff alleges that as a result of the parties' agreement to share in the profits, a partnership relationship was created. The elements of a joint venture are: (i) an express or implied agreement manifesting the parties intent to be joint venturers, (ii) a contribution by both to the joint task, (iii) sharing of profits and losses, and (iv) joint control. *See Natuzzi v. Rabady,* 177 A.D.2d 620, 622, 576 N.Y.S.2d 326, 328 (2d Dept.1991); *Ackerman v. Landes,* 112 A.D.2d 1081, 1082, 493 N.Y.S.2d 59, 60 (2d Dept.1985). Plaintiff fails to assert and/or prove the existence of a joint venture by failing to allege that the parties would share any losses from the cases. *See Gold Mechanical Contractors v. Lloyds Bank P.L.C.,* 197 A.D.2d 384, 602 N.Y.S.2d 136, 137 (1st Dept.1993) (dismissed cause of action for failure to state a claim where there was no allegation of shared losses; agreement to share proceeds or a sharing of gross returns alone does not in and of itself establish a joint venture).

▮ Even assuming, *arguendo,* that Plaintiff adequately plead the elements of a joint venture, the fee-splitting agreement did not create a trust relationship between the parties because, as a matter of law, Defendant did not act in a "fiduciary" capacity within the meaning of the discharge excep-

tion. *In re Mason (Tillman v. Mason),* 191 B.R. 50 (Bankr.S.D.N.Y.1996). Although federal law determines who is a "fiduciary" for purposes of Section 523(a)(4), state law is relevant in determining whether such a relationship exists. *Driggs v. Black (In re Black ),* 787 F.2d 503, 506 (10th Cir.1986); *In re Schwenn,* 126 B.R. 351, 352 (D.Colo.1991); *In re Goseland,* 114 B.R. 263, 268 (D.Kan. 1990); *In re Jardula,* 122 B.R. 649, 656 (Bankr.E.D.N.Y.1990). A substantial factor to be considered in determining the existence of a fiduciary relationship is the intent to create a trust relationship, rather than a contractual relationship. *Gans,* 75 B.R. at 490. When a referring attorney brings an action against the receiving attorney to collect the agreed fee, the action is one for the enforcement of a contract. *Rodriguez v. City of New York,* 66 N.Y.2d 825, 498 N.Y.S.2d 351, 489 N.E.2d 238 (1985). Upon this Court's examination of the relationship between Defendant and Gore, and the obligations of Defendant with respect to fees that he received, this Court finds that Defendant and Gore were in a purely contractual relationship with one another. *See Matter of Marchiando,* 13 F.3d 1111, 1116 (7th Cir. 1994). The relationship between them was not as co-fiduciaries. Therefore, the failure on the part of the receiving attorney to pay to the referring attorney the agreed share of the fee is a breach of contract. *See In re Jacone,* 156 B.R. at 744 (substantial factor to be considered in determining the existence of a fiduciary relationship for non-dischargeability purposes is intent to create a trust rather than a contractual relationship); *In re Meltzer,* 171 B.R. 166 (Bankr.S.D.Fla.1994) (mere failure to perform in accordance with a contract will not render debt non-dischargeable as one for actual fraud).

A case on point is *People v. Keeffe,* 50 N.Y.2d 149, 428 N.Y.S.2d 446, 405 N.E.2d 1012 (1980). In *Keeffe,* the Court of Appeals held that a larceny had not been committed by a successor attorney whose special account balance fell to less than the amount to which the predecessor attorney was entitled. Specifically, the Keeffe Court determined that the fact that proceeds of a settlement had been deposited in the attorney's account

did not make them trust funds, even though there was an intermediate order providing that a predecessor attorney was entitled to a certain portion of those funds. *Id.* at 450–51, 405 N.E.2d at 1015–17.

In *Keeffe,* a wrongful death action was settled by Keeffe, an attorney. In a compromise approval proceeding that followed, a predecessor attorney, D'Isernia, claimed a lien on the settlement proceeds for his fee. *Id.* at 448, 405 N.E.2d at 1013–14. In 1975, an intermediate court order was entered, authorizing the administrator, a third party, to pay D'Isernia a fee of $2,500 in which he was entitled to as former attorney and that such fee would be charged against the balance of attorneys' fees due to the attorneys for the estate. *Id.* The order further permitted partial distribution to Keeffe. *Id.* Within a few days after the order was entered, settlement checks totaling $120,000 were deposited in Keeffe's special attorney's account. *Id.* Subsequent to this intermediate order, Keeffe made no payment to the former attorney but depleted the account. *Id.*

The Court of Appeals concluded that all that the intermediate order adjudged the former attorney to have "was a contract right to recover a fee, not any 'property' or 'owner' interest superior to that of defendant in the proceeds of settlement of the malpractice action." *Id.* at 450, 405 N.E.2d at 1015. In the Court's view, the former attorney was merely a creditor of Keeffe. *Id.* The Court further held that the fact that the settlement proceeds had been deposited in Keeffe's attorney's account does not make them "trust" funds and as such a subject larcenous taking. *Id.* In addition. the Court concluded that the relevant regulations, such as Disciplinary Rule 9–102 of the Code of Professional Responsibility, are not violated by the failure to pay money to a third person to whom the client is obligated. *Id.* at 451, 405 N.E.2d at 1016–17.

Similarly, and for many of the aforementioned reasons articulated in the *Keeffe,* case, this Court cannot escalate Kressner's failure to meet a contractual obligation into a breach of fiduciary duty under New York law as well as under Bankruptcy Code Section 523(a)(4).

Moreover, while it is well established under New York law, that an attorney stands as a fiduciary to his client, (*See In re Riley,* 266 A.D. 160, 43 N.Y.S.2d 753 (1943)), to trigger application of Bankruptcy Code Section 523(a)(4), there must be an express or technical trust relationship between the debtor and aggrieved creditor. *In re Casey,* 181 B.R. 763 (Bankr.S.D.N.Y.1995). Unlike the well-established fiduciary trust relationship between a client and his attorney, in the instant matter the Court is dealing with an alleged contractual relationship between two attorneys, Gore and Kressner. The Court further recognizes that it is not uncommon for lawyers to refer work not within their specialty and to enter into fee agreements with outside attorneys. In the instant case, the State Court found that Kressner had such an agreement with Gore which Kressner breached and the State Court entered a judgment against Kressner. Under *Gans, Rodriguez* and *Keeffe,* this Court finds the relationship between Gore and Kressner to be a purely contractual relationship.

Furthermore, as the Court concluded in *Marchiando,* 13 F.3d at 1115–16, pursuant to Section 523(a)(4), there is a distinction between a trust or other fiduciary relation that has an existence independent of the debtor's wrong and a trust or other fiduciary relation that has no existence before the wrong is committed. As the *Marchiando* court stated, a lawyer's fiduciary duty to her client or a director's duty to her corporation's shareholders pre-exists any breach of that duty, while in the case of a constructive or resulting trust, there is no fiduciary duty until the wrong is committed. *Id.* In the instant case, the Court finds a purely contractual relationship between Gore and Kressner. Prior to its breach, no fiduciary relationship existed between these two individuals. They were merely parties to a contract. Subsequent to its breach, Kressner and Gore's relationship was merely transformed into a debtor-creditor relationship. Even if Plaintiff was successful in proving unjust enrichment by Defendant, at best, a constructive trust could be imposed to remedy the harsh result. However, as further discussed below, for non-dischargeability purposes under Section

523(a)(4), a constructive trust is not sufficient to create a fiduciary relationship.

 Plaintiff produced an expert witness, Mr. Anthony Davis, who testified why he believed a fiduciary relationship existed between Debtor and Gore based upon legal ethics/professional responsibility. It appears to the Court that Mr. Davis viewed this case in a vacuum, considering his admission that he did not review the entire case file, specifically that he had not read any of the opposition papers or prior published decisions in this case. (Tr. at 71). He further testified that he did not even review the entire transcript of the trial in the State Court action. (Tr. at 71). Additionally, "[a]lthough the concept of fiduciary is to be narrowly defined as a matter of federal law, state law is to be consulted to determine when a trust in this strict sense [i.e., under section 523(a)(4) ] exists." *In re Stone*, 94 B.R. 298, 303 (S.D.N.Y.1988), *aff'd*, 880 F.2d 1318 (2d Cir. 1989), *citing Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986). There is great doubt in the Court's mind as to the thoroughness of Mr. Davis' testimony because he had not taken his analysis to the next step, namely applying state law to these ethical considerations. Mr. Davis further testified that he did not even form an opinion of whether a joint venture existed (Tr. at 80–81), nor did he consider Judge Schwartzberg's declaration that a mere referral fee was not sufficient to form a joint venture. (Tr. at 81). Mr. Davis testified as to his opinion with respect to state law as to the fiduciary relationship between Gore and Kressner arising from a referral fee agreement and to the fiduciary relationship of a receiving attorney with respect to a fee as to which others may have a claim. Mr. Davis testified that the information upon which he based his opinion was that the State Court had concluded that there was a proper and valid fee agreement. (Tr. at 83–84). However, Mr. Davis further testified that even if this fee arrangement was invalid, Debtor would still be a fiduciary because he would not be entitled to be unjustly enriched if he made this agreement. (Tr. at 84). Mr. Davis' basis for his opinion is in direct contravention of Judge Schwartzberg's decision stating that there must be a joint venture in order to find a fiduciary

relationship and that a mere referral arrangement does not give rise to a joint venture. Moreover, as to Mr. Davis' opinion of a fiduciary relationship with respect to unjust enrichment, courts have long recognized that a constructive trust may be imposed to put the parties in status quo and prevent unjust enrichment. *See, e.g., Janke v. Janke*, 47 A.D.2d 445, 366 N.Y.S.2d 910, *aff'd without opinion*, 39 N.Y.2d 786, 385 N.Y.S.2d 286, 350 N.E.2d 617 (1976); *Friddell v. Alberalla*, 176 A.D.2d 1213, 576 N.Y.S.2d 709, *appeal denied*, 79 N.Y.2d 751, 580 N.Y.S.2d 198, 588 N.E.2d 96 (1991); *In re Landrin,* 173 B.R. 307 (Bankr.S.D.N.Y.1994). Yet for non-dischargeability purposes under Section 523(a)(4), it is further well-established that a constructive trust is not sufficient to create a fiduciary relationship. *See, e.g., In re Long*, 774 F.2d 875 (8th Cir.1985); *Matter of Angelle*, 610 F.2d 1335 (5th Cir.1980). Consequently, Mr. Davis' opinion of a fiduciary relationship based upon the theory of unjust enrichment and constructive trust is also in clear contravention of well-settled case law that such constructive trusts do not fall within the purview of Section 523(a)(4).

 In the Third Cause of Action, Plaintiff objects to the dischargeability of her claim against the Defendant on the ground that the debt resulted from the Defendant's embezzlement of Plaintiff's funds while acting in a fiduciary capacity, as escrow agent and individually. Embezzlement under Section 523(a)(4) is to be determined under federal common law, which defines it as the fraudulent appropriation of money by a person to whom such property had been entrusted or into whose hands it has lawfully come. *In re Bevilacqua*, 53 B.R. 331, 333 (Bankr. S.D.N.Y.1985). To establish embezzlement for non-dischargeability purposes, the claimant must show that the debtor misappropriated funds for his own purpose and that he did so with fraudulent intent or deceit. *Id.* at 334. When a case is referred from one attorney to another, there are at least two agreements: the one with the client and the one with the referring attorney. In the instant case, the funds belonged to the Newmans, the Newmans signed a retainer with Gore, and therefore the Newmans were obli-

gated to Gore. Defendant thus held client money in trust for proper disbursement. However, the record is devoid of any evidence that the Defendant acted with the requisite fraudulent intent when he failed to divide the fees with Gore. In evidence is the paper signed by Bernard Gore that Kressner is to be trial counsel for fifty-percent of the fees which evidences the agreement to split fees. (Plaintiff's Exhibit F). Yet, the failure to split fees and the resulting breach of this agreement, without more, is not tantamount to fraud and embezzlement.

 An obligation may be found non-dischargeable for embezzlement under Section 532(a)(4) even if the debtor did not act in a fiduciary capacity. *In re Stephens*, 51 B.R. 591, 595 n. 3 (9th Cir. BAP 1985); *In re Crosswhite*, 91 B.R. 156, 159 (Bankr.M.D.Fla. 1988); *Jardula*, 122 B.R. at 653; *Bevilacqua*, 53 B.R. at 333. The critical question of fact is the Defendant's state of mind when he failed to divide the fees with Gore. As previously stated, the State Court dismissed the fraud claim, *supra* at 308, and this Court also finds no evidence of fraudulent intent.

It is abundantly clear to this Court that Plaintiff has failed to meet her burden in proving that the debt is non-dischargeable under Section 523(a)(4). Plaintiff has failed to establish that a true fiduciary relationship existed by operation of law. At best, this is a breach of contract claim. Therefore, this Court finds that the contract establishing the fee-splitting arrangement between Gore and Kressner did not give rise to a fiduciary relationship and that there was no evidence of fraudulent intent.[7]

### Denial of Discharge—Section 727

 In the Fourth Cause of Action, Plaintiff seeks a denial of the Defendant's discharge under Section 727(a)(3) on the ground that Defendant "failed to keep or preserve records, or that the debtor unjustifiably destroyed such records." *In re Wolfson*, 139 B.R. 279, 286 (Bankr.S.D.N.Y.1992),

*aff'd*, 152 B.R. 830 (S.D.N.Y.1993). The purpose of Section 727(a)(3) is to provide creditors and the Court with "complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requirement to a discharge." *In re Gannon*, 173 B.R. 313, 321 (Bankr.S.D.N.Y.1994). "[T]he issue to be resolved when an objection to discharge founded on section 727(a)(3) is raised is whether debtor's records are adequate to explain his finances and, if not, whether the failure to do so is justified." *Id.,citing In re Reitz*, 69 B.R. 192, 197 (N.D.Ill.1986).

 The adequacy of a debtor's books and records is to be evaluated on a case-by-case basis, considering the size and complexity of the debtor's business. *In re Potter*, 88 B.R. 843, 848 (Bankr.N.D.Ill.1988). Such a case-by-case inquiry need not consider whether the debtor intended to defraud the plaintiff; intent is not an element of a Section 727(a)(3) objection to discharge. *Id.* In this case, Plaintiff claims that the records produced by the Defendant are inadequate. Defendant claims he produced "thousands of documents" (Tr. at 206) that could potentially refute the allegations made by the Plaintiff, and from which the financial condition of the Defendant, and his business transactions for a reasonable period in the past, may be ascertained. Because of the volume of documents requested and produced, Plaintiff's counsel, accompanied by no less than two accountants, twice appeared at Defendant's home-office to review the documents. Curiously, although one of the accountants was listed as a witness on the pre-trial order, no accountant was called to testify by Plaintiff at trial. Because Plaintiff failed to specify which documents were allegedly missing and which documents were in fact produced, it would have assisted the Court if at least one of the accountants had testified concerning a determination whether or not the documents actually produced were adequate for Plaintiff to create a trail from the documents, and if

---

7. Although Plaintiff does not assert, in her complaint, a claim against the Debtor under Section 523(a)(6), she contends in her Post–Trial Memorandum of Law at pp. 13–14, that the Debtor's actions constitute willful and malicious conduct pursuant to Section 523(a)(6). Since this claim was not asserted in the complaint nor did Plaintiff amend her complaint to include this claim, this claim is not properly before this Court and therefore this Court cannot address or consider it in rendering its decision.

they were inadequate, to testify why. It is Plaintiff's burden to have done this in light of the onerous penalty of a finding of a denial of discharge under Section 727 based on nebulous proof proffered by Plaintiff. It appears that some documents relating to the Defendant are unaccounted for, but the evidence presented by Plaintiff is too nebulous to justify a finding that the Defendant refused to obey the Court's order to turn them over to the Plaintiff. Based upon this record, the Court finds Plaintiff's claim of the inadequacy of the Defendant's production of documents to be unfounded.

In Plaintiff's Fifth Cause of Action, Plaintiff objects to the debtor's discharge under Section 727(a)(4)(A) on the ground that he knowingly and fraudulently made a false account of the current status of his assets in his petition filed September 17, 1991. In order to establish a basis for the debtor's discharge pursuant to Section 727(a)(4)(A), Plaintiff must establish that (1) the debtor made a statement under oath, (2) the statement was false, (3) the debtor knew the statement was false, (4) the debtor made the statement with fraudulent intent, and (5) the statement related materially to the bankruptcy case. *In re Emery,* 170 B.R. 777, 783 (Bankr.E.D.N.Y.1994) (citations omitted). In the context of a bankruptcy case, a false oath sufficient to justify the denial of discharge may include a false statement or omission in the Debtor's schedules, or a false statement by the debtor at an examination during the course of the proceedings. *Matter of Beaubouef,* 966 F.2d 174, 178 (5th Cir.1992) (*citing* 4 COLLIER ON BANKRUPTCY, § 727.04[1] at 727–59 (15th ed.1992)).

Plaintiff relies upon an asset and liability sheet dated June 20, 1988 (Plaintiff's Exhibit A), prepared by Defendant's accountant, Mark Goldfarb. Plaintiff alleges that Defendant's discharge should be denied because the sheet shows that as of June 20, 1988, Debtor and his wife owned personal property worth approximately $140,000.00 (Tr. at 199–200), and Defendant testified that as of the date of the filing of his petition in September, 1991, the personal property no longer had any value. (Tr. 199–201) Plaintiff alleges that Defendant has failed to account for the property or provide a list of the property and their disposition. Kressner testified that the personal property was mostly gifts his wife had received from her parents and that the cars (which were also repossessed) also belonged to his wife. Plaintiff then asks the Court to compare the asset-liability sheet against a 1988 loan application for Dollar Dry Dock where Defendant listed that he alone had approximately $180,000 in personal property. A blind reading of these documents is unjustified, and the picture must be examined. In fact, three years after this loan application was submitted, Defendant filed his bankruptcy petition. In the Court's view, this reflects a definite change in financial circumstances amply supported by testimony of a number of witnesses at trial. The $180,000 value listed by Defendant was an optimistic estimate of Defendant's worth. Then when things went badly for the Defendant and his financial situation deteriorated, he was forced to look at the reality of what his assets were really worth.

Defendant was subpoenaed to produce checks at his 2004 examination. While Defendant failed to bring the checks, he did produce his bank records. Defendant was questioned concerning his 1990 Income Tax Return, filed the year he filed for bankruptcy protection, which indicates a receipt of $553,000 in income and which money is reflected in the bank records. Defendant testified that the $523,000 "phantom income" derived from tax shelters, and "[n]ot one penny of that did [he] ever get in actual money" but it was fully disclosed on his tax return. (Tr. at 204). Mark Goldfarb, Defendant's accountant also testified that the $553,000 dealt with investments. Additionally, Defendant testified that he received income from investments of approximately $40,000 and $17,000. This disclosure of the income earned prepetition is relevant to an understanding of a debtor's financial condition. Plaintiff has failed to prove that Defendant's failure to disclose the information requested precludes discharge.

The record is replete with testimony evidencing the hardships faced by Defendant and his family and Defendant's bleak finan-

cial situation.[8] Witness Irene Latino has known the Kressners for 24 years and testified that she was aware of the hardships in their lives, including Mrs. Kressner's battle with kidney disease and that the Kressners' home, prior to being foreclosed upon, was in disrepair and lacked heat in the winter. Although she was a limited partner in Roaring Brook Estates business deal with Defendant and lost $20,000 on her investment, Ms. Latino nevertheless lent Defendant between $5,000 and $10,000 on an as needed basis to help out financially. The next witness was Michael B. Gluck, an attorney who had worked with Defendant and took over Defendant's law practice when he was suspended. Mr. Gluck testified that he also was aware of the Kressners' hardships, had assisted Defendant financially and has not since been repaid. Additionally, Mr. Gluck testified that he turned over at least $30,000 to the sheriff when he was served with a restraining notice related to any money that came into the Defendant's law practice. Finally, witness David Gendleman, who, like Ms. Latino, had lost money as an investor with the Defendant, nevertheless also lent money to the Defendant, specifically between $12,000 and $13,000 over a period of years. Based upon the testimony of these witnesses, all of whom are still owed money by the Defendant, and the documentation produced, this Court finds that there was such a substantial decline in the Defendant's financial situation sufficient to rebut any allegation that the Defendant knowingly and fraudulently made a false account of the current status of his assets in his petition. Therefore, the Plaintiff's Fifth Cause of Action objecting to the Defendant's discharge under Section 727(a)(4)(A), fails.

■ In the Sixth Cause of Action, Plaintiff asserts that the Defendant's discharge should be denied pursuant to sections 727(a)(6)(A) and (a)(6)(C) because the Defendant failed to answer questions or provide information at an examination ordered and directed by the Court pursuant to an order dated December 2, 1991, for a rule 2004 examination. The Court has reviewed the transcript of the Defendant's examination (Plaintiff's Exhibit 0–1 & 2) and is satisfied that the Defendant answered the questions to the best of his knowledge and produced all relevant documentation within his control. The Court finds that Defendant did not violate the 2004 order. As for the allegation that the Defendant refused to respond to questions posed to him at the 2004 examination, the Court finds that the Defendant was exercising his rights and not necessarily disobeying a Court order.

For the foregoing reasons, it is

ORDERED, that Plaintiff's complaint insofar as it seeks non-dischargeability of the debt claimed to be owing by the Defendant to the Plaintiff pursuant to Section 523(a)(2)(A) is denied: it is further

ORDERED, that Plaintiff's complaint insofar as it seeks non-dischargeability of the debt claimed to be owing by the Defendant to the Plaintiff pursuant to Section 523(a)(4) is denied: and it is further

ORDERED, that Plaintiffs complaint insofar as it seeks to have the discharge of the Debtor/Defendant barred pursuant to Sections 727(a)(3), (a)(4)(A), (a)(6)(A) and (a)(6)(C) is denied and his discharge shall remain in full force and effect.

**8.** Upon review of the transcript of the trial of this matter, it was discovered that portions of the Defendant's character witnesses' testimony was omitted from the transcript, apparently due to a faulty audiotape. Nevertheless, in the interest of judicial economy, the parties agreed to allow the Court to render a decision based upon the Court's notes and memory of the testimony.

As previously stated, it is the Plaintiff's burden of proof to show the elements necessary to bar a discharge or the dischargeability of a claim. Here, the omitted portions of the transcript solely relate to character witnesses called to testify by Kressner and not by the Plaintiff. These witnesses merely testified as to the character of the Defendant and thus, their testimony was accorded little weight by the Court.